**LEE LITIGATION GROUP, PLLC**
C.K. Lee, Esq. (CL 4086)
James Jackson, Esq. (JJ 419892022)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff, FLSA Collective Plaintiffs, and the Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOEL AGUILAR, *on behalf of himself, FLSA Collective Plaintiffs, and the Class,*<br><br>Plaintiff,<br>v.<br><br>COSMOPOLITAN STAFFING SERVICES, LLC,<br>CENTURION STAFFING GROUP, LLC,<br>MARQUIS STAFFING GROUP, LLC,<br>ELITE PERSONNEL GROUP, LLC,<br>COSMOPOLITAN MEDICAL STAFFING SOLUTIONS, LLC,<br>CRIEL DE MESA,<br>METROPOLITAN FOODS, INC. d/b/a DRISCOLL FOODS,<br>and JOHN DOE CORPORATIONS 1-999,<br><br>Defendants. | Case No.: 25-cv-14787<br><br>**FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff JOEL AGUILAR ("Plaintiff"), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this First Amended Class and Collective Action Complaint against Defendants COSMOPOLITAN STAFFING SERVICES, LLC, CENTURION STAFFING GROUP, LLC, MARQUIS STAFFING GROUP, LLC, ELITE PERSONNEL GROUP, LLC, COSMOPOLITAN MEDICAL STAFFING SOLUTIONS, LLC, CRIEL DE MESA (collectively, the "Cosmopolitan Defendants"), METROPOLITAN FOODS, INC., d/b/a DRISCOLL FOODS ("Driscoll Defendant"), and JOHN DOE CORPORATIONS 1-

999 (collectively, the "Defendants") and states as follows:

**INTRODUCTION**

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid overtime premiums; (2) liquidated damages; and (3) attorneys' fees and costs.

2. Plaintiff further alleges, pursuant to the New Jersey Wage Payment Law ("NJWPL") and the New Jersey Wage and Hour Law ("NJWHL"), that he and others similarly situated are entitled to recover from Defendants: (1) unpaid wages, including overtime wages; (2) statutory penalties; (3) liquidated damages; and (4) attorneys' fees and costs.

3. Cosmopolitan Defendants operate a staffing agency which provides services for clients, recruiters, and candidates. These services include, but are not limited to, matching candidates for temporary and permanent jobs with appropriate recruiters, providing job posting services for recruiters, recruiting and compensating clients' temporary staff, and offering online job boards for candidates, as described on Cosmopolitan Defendants' website, available at https://www.cosmopolitanstaffing.com/home/about. *See* **Exhibit A**.

4. Driscoll Defendant is a foodservice distributor primarily operating in the Northeast of the United States. Driscoll Defendant is one of Cosmopolitan Defendants' clients and operate as a joint employer to the employees hired by Cosmopolitan Defendants to work at Driscoll Defendant's warehouse, which is located at 6 Westbelt, Wayne, NJ 07470.

5. Plaintiff, FLSA Collective members and Class members are all current and former employees who were recruited by Cosmopolitan Defendants to work as temporary employees for Cosmopolitan Defendants' clients, which are corporations seeking to staff factory lines to package or repackage food items and other products.

6. Plaintiff brings this wage and hour class action on behalf of himself and all persons, who during the applicable limitations period up to and including the present, were similarly underpaid by Defendants in violation of protections afforded under the FLSA, and the laws and regulations passed in the following states:

1) New York: New York Labor Law, Article 19 § 650 et seq., and Article 6 § 190 *et seq.;*
2) New Jersey: New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq,*; and the New Jersey Wage and Hour Law, N.J.S.A.
3) Pennsylvania: Pennsylvania Minimum Wage Act 43 Pa. Cons. Stat. § 333.101 *et seq*.;
4) Virginia: Virginia Minimum Wage Act, VA Code § 40.1 *et seq.;*
5) Michigan: Michigan Workforce Opportunity Wage Act, MCL §§ 408.411, *et seq.;*
6) Maryland: Maryland Wage and Hour Law, Md. Code. Ann. Lab & Empl. § 3-401 *et seq*., and the Maryland Wage Payment Collection Law, Lab. & Empl. § 3-501, *et seq.;*
7) North Carolina: North Carolina General Statutes, N.C. Gen. Stat. § 95-25.4, *et seq;*
8) Colorado: Colorado Wage Claim Act, Colo. Rev. Stat. § 8-4-101 *et seq*.; and the Colorado Minimum Wage Act, Colo. Rev. Stat. § 8-6-101 *et seq.;*
9) Texas: Texas Minimum Wage Act, Texas Labor Code § 62.001 *et seq.;*
10) Nevada: Nevada Minimum Wage Amendment of the Nevada Constitution, Nev. Const. art. 15, §16, and the Nev. Rev. Stat. Chapt. 60;
11) California: California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17220-17210; and the California Labor Code and relevant Industrial Welfare Commission Wage Order;
12) Massachusetts: Massachusetts Minimum Fair Wage Law, Mass. Gen. L. ch. 151, §1A *et seq*.;
13) Ohio: Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.01 *et seq.;*
14) Florida: Florida's Unpaid Wages Statute, Fla. Stat. 448.08 *et seq.;*
15) Connecticut: Connecticut Wage Act Conn. Gen. Stat. §§ 31-58, *et seq*.;
16) Tennessee: Tennessee Code Annotated, Tenn. Code. Ann. §50-2-114;
17) Indiana: Indiana Wages Hours and Benefits, Ind. Code §22-2-2 *et seq*. Indiana Frequency of Wage Payments Ind. Code §22-2-5 *et seq.;*
18) Kentucky: Kentucky Wage Statutes, K.Y. Rev. Stat. Ann. §337.275, *et seq;*
19) Kansas: Kansas Labor and Industries Law, Kan. Stat. Ann. §§44.1201 *et seq;*
20) Idaho: Idaho Minimum Wage Law 44-1501 *et seq.*, Hours Worked Act §44-1201 *et seq.*, and the Liens, Mortgages, and Pledges, Idaho Code § 45-601 *et seq.*

(collectively, the "Relevant State Wage and Hour Laws", or "RSWHL"

7. To the extent that gap-time claims (claims for unpaid wages for hours worked up to forty which do not implicate statutory minimum wage laws) or claims seeking damages for failure to pay for all hours of work, are not covered by the protection of a State's wage laws,

Plaintiff further alleges that they and others similarly situated are entitled to recover from Defendants, the following pursuant to breach of contract and unjust enrichment: (1) wrongfully withheld or diverted payments, (2) punitive damages due to egregious conduct, and (3) attorneys' fees and costs.

8. Plaintiff, FLSA Collective Plaintiffs, and Class members were all victims of Defendants' failure to pay wages, including overtime wages. Defendants instituted a nationwide policy of not compensating wages for all hours worked, including (i) not tracking actual hours worked, and (ii) compensating employees based on a fixed schedule, regardless of whether employees worked longer than their scheduled shifts.

9. Plaintiff brings this wage and hour class action on behalf of himself and all Class members employed by Defendants nationwide, who during the applicable state and federal limitations period (the "Class Period"), were similarly underpaid by Defendants in violation of protections afforded under the FLSA and the regulations of the above states.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

11. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391 because Defendants' hiring process occurred in this District, and the underpayment of Plaintiff and (as outlined in this Complaint) emanated from this District.

## PARTIES

12. Plaintiff JOEL AGUILAR is a resident of Essex County, New Jersey.

13. Individual Defendant CRIEL DE MESA owns and operates a staffing agency enterprise, comprised of five (5) affiliates in New Jersey that have been under the following trade

names:

a) Cosmopolitan Staffing Services, 200 Davidson Avenue, Somerset, NJ 08873

b) Centurion Staffing Group, 200 Davidson Avenue, Somerset, NJ 08873

c) Marquis Staffing Group, 200 Davidson Avenue, Somerset, NJ 08873

d) Elite Personnel Group, 200 Davidson Avenue, Somerset, NJ 08873

e) Cosmopolitan Medical Staffing Solutions, 200 Davidson Avenue, Somerset, NJ 08873 (collectively, the "Agencies").

14. Cosmopolitan Defendants operate, recruit, and target temporary workers residing in New York State, New Jersey, Pennsylvania, and other states throughout the United States.

15. Cosmopolitan Defendants own and operate the Agencies as a single integrated enterprise, under the parent company COSMOPOLITAN STAFFING SERVICES, LLC. Specifically, the Agencies are engaged in related activities, share common ownership, and have a common business purpose.

a) The Agencies share common ownership through Individual Defendant CRIEL DE MESA and the remaining Cosmopolitan Defendants. Moreover, Individual Defendant CRIEL DE MESA identifies as the owner of the Agencies on his LinkedIn page and on Cosmopolitan's blog. *See* **Exhibit B.**

b) Corporate Defendant COSMOPOLITAN STAFFING SERVICES, LLC lists Centurion Staffing Group, Marquis Staffing Group, Elite Personnel Group, and Cosmopolitan Medical Staffing Solutions as its affiliates on its website. *See* **Exhibit C.**

c) On their Facebook profiles, Cosmopolitan Defendants list the same addresses, the same emails, and links directing users to the same website: www.cosmopolitanstaffing.com. *See* **Exhibit D.**

d) Cosmopolitan Defendants share a common place of incorporation, as indicated by the New Jersey Department of the Treasury's Division of Revenue and Enterprise Services' Business Search, which shows that most were incorporated in Somerset, NJ. *See* **Exhibit E.**

e) Cosmopolitan Defendants are all owned by Individual Defendant CRIEL DE MESA and operate as a single integrated enterprise. *See* **Exhibit F.**

f) On Google Maps, Cosmopolitan Defendants share a common address: 220 Davidson Avenue, Ste 102, Somerset, NJ 08873. *See* **Exhibit G.**

g) Cosmopolitan Defendants have a centralized Human Resources Department and Administration Department that deals with hiring, firing, and administering all the Agencies' work force. *See* **Exhibit F.**

h) Cosmopolitan Defendants jointly advertise their services on Facebook. For example, the Agencies share each other's posts and list points of contact with email addresses of staff from affiliated companies. *See* **Exhibit H.**

i) All temporary workers hired by Defendants utilize the same onboarding documents and are subject to the same payroll practices. The onboarding documents provided to employees by Cosmopolitan Defendants also state that Cosmopolitan Defendants are affiliates of COSMOPOLITAN STAFFING SERVICES, LLC. *See* **Exhibit I.**

j) All temporary workers hired by Cosmopolitan Defendants and placed with JOHN DOE CORPORATIONS 1-999 are all subject to the same policies where they are not paid for their actual hours worked, are not tracked for actual hours worked, and are only paid on a fixed schedule basis.

k) The fact that Cosmopolitan Defendants operate as a joint employer and as a single integrated enterprise as to putative class members is also confirmed within the deposition testimony of Defendants' Operations Manager Ana Cruz, which was filed on the public docket of the case found at *SIRI v. NORTH AMERICAN PACKAGING, LLC et al*, case no. 2:25-cv-01186 at Dkt. 42-5 ("Ana Cruz Deposition Transcript").

l) The deposition of Ana Cruz confirms that Cosmopolitan Defendants manage class members at each of individual job location: "As an onsite, we have responsibilities to be between the client and the temps that we send every day…They explain to the temps their duties, their responsibility, their breaks, where the lunchroom is. They sign them up to make sure they're on the list and then their responsibility on a daily basis." *See* id. at 8:15-24.

m) This management was explicitly admitted to by Ana Cruz: "Q. Okay. So when you say you "manage the onsites," do you mean you are managing the temp workers onsite or -- A. Yes." *See* id. at 9:20-23.

n) Ana Cruz also confirms that pay rates for putative class members is set between Defendants and their clients as to each employee: "Q. Okay. But, I mean, obviously, a client, such as Econo-Pak, would have to agree to the salary rates for workers because they're paying it; correct? A. Correct." *See* id. at 26:21-25.

o) Ana Cruz confirmed that Cosmopolitan Defendants' workers for all of their clients are tracked and paid in the same manner: "Q. Okay. So for most of your

clients, do your temp workers get paid in accordance with a punch-in/punch-out time? A. They get paid based on the start time, when they start working on the line." *See* id. at 30:23-31:2. When asked again, Ms. Cruz confirmed the scope of the procedure: "Q. I'm just talking about your temp workers, generally, not necessarily at Econo-Pak. A. No. All of my clients. All of my clients, yeah." *See* id. at 31:3-7.

p) Finally, Ana Cruz confirms that Cosmopolitan Defendants maintain the power to oversee employees at each site and make decisions as to punishment including termination: "A:…If the person is -- if the temporary employee, let's say, is behaving in a way that is not correct, yelling, spilling, they can make that decision based on that. Q. The onsite [Cosmopolitan Representative] can make the decision? A. Right. Based on behavior, correct." *See* id. at 67:5-13.

16. Each of the Cosmopolitan Defendants are staffing agencies that specialize in placing temporary, temp-to-hire, and direct hire employees across various industries. Each Cosmopolitan Defendant is a domestic limited liability company organized under the laws of New Jersey, with a principal place of business and service of process located at 220 Davidson Avenue, Somerset, NJ 08873.

17. Individual Defendant CRIEL DE MESA is the President and CEO of each of the Cosmopolitan Defendants. CRIEL DE MESA exercises operational control as it relates to all employees including Plaintiff, FLSA Collective Plaintiffs, and the Class. CRIEL DE MESA exercises the power to (and also delegates to managers and supervisors the power to) fire and hire employees, supervise and control employee work schedules and conditions of employment, and determine the rate and method of compensation of employees including those of Plaintiff, FLSA Collective Plaintiffs, and the Class. CRIEL DE MESA has the authority to effect any changes to the quality and terms of employees' employment, including changing their schedule, compensation, or terminating or hiring such employees. CRIEL DE MESA exercised functional control over the business and financial operations of Corporate Defendants. CRIEL DE MESA had the power and authority to supervise and control supervisors of Plaintiff, FLSA Collective Plaintiffs, and Class members, and could reprimand employees.

18. Defendant METROPOLITAN FOODS, INC., d/b/a DRISCOLL FOODS is a domestic company organized under the laws of New Jersey, with a principal place of business and service of process located at 6 Westbelt Wayne, NJ, 07470-6810.

19. Defendants JOHN DOE CORPORATIONS 1-999 are the clients of Cosmopolitan Defendants who, with the Cosmopolitan Defendants, are the joint employers of Plaintiff, FLSA Plaintiffs, and Class members.

20. At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" within the meaning of the FLSA, RSWHL, and regulations thereunder.

21. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs, and Class members was directly essential to the business operated by Defendants.

22. Plaintiff has fulfilled all conditions precedent to the institution of this action and/or such conditions have been waived.

## JOINT EMPLOYER ALLEGATIONS

23. Defendants are joint employers under the FLSA and Relevant State Wage and Hour Laws, as they (1) have the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *See Talarico v. Pub. P'ships, LLC,* 837 F. App'x 81, 84 (3d Cir. 2020).

*Joint Employer Allegations as to Cosmopolitan Defendants*

24. Cosmopolitan Defendants were responsible for the hiring and firing of Plaintiff and other employees. After screening and interviewing Plaintiff and other employees, Cosmopolitan Defendants hired Plaintiff and other employees to work at various facilities owned and operated by the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999. Both

Cosmopolitan Defendants and their clients, the Driscoll Defendant as well as the JOHN DOE CORPORATIONS 1-999, may hire or terminate employees.

25. Cosmopolitan Defendants maintain on-site representatives at the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999's facilities to process employees' administrative and HR requests, such as time-off approvals and requests for accommodation, which require the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999's approvals. Plaintiff, as well as other employees, was advised by Cosmopolitan Defendants that these on-site representatives would be his primary point of contact for any workplace-related concern. In their roles, on-site representatives had authority to handle and provide remedial responses to employee complaints, and also regularly acted as intermediaries between employees and the Driscoll Defendant as well as the JOHN DOE CORPORATIONS 1-999, relaying employee complaints and collaborating with the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 to address any wage issues and policies. *See* Ana Cruz Deposition Transcript**.**

26. In addition to clock-in and clock-out procedures (detailed later), Cosmopolitan Defendants' on-site representatives maintain records of employee attendance to which the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 had access. Cosmopolitan Defendants and their clients, the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999, discussed staffing needs and employee issues (if any) on a weekly basis, and resolved such issues jointly, such as scheduling and compensation. *See* Ana Cruz Deposition Transcript**.**

27. Compensation was jointly managed by Cosmopolitan Defendants and their clients, the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 set employees' pay rate, including Plaintiff's, and such rates required Cosmopolitan Defendants' approvals. JOHN DOE CORPORATIONS 1-999

tracked employees' hours through their timekeeping systems and reported them to Cosmopolitan Defendants for payroll processing. Cosmopolitan Defendants then disbursed wages via pre-paid cards, relying on Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999's recorded data. Cosmopolitan Defendants paid employees by reloading employees' pre-paid cards with earned wages at the end of every pay period.

28. Cosmopolitan Defendants maintained payroll records of Plaintiff and other employees.

*<u>Joint Employer Allegations as to the Driscoll Defendant and John Doe Corporations 1-999</u>*

29. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 are clients of Cosmopolitan Defendants, for whom Cosmopolitan Defendants recruit temporary workers on their factory lines. They have reserved the right to terminate employees, including Plaintiff. Cosmopolitan Defendants may implement firing determinations made by Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 to employees, merely acting as the conduit to communicate the decision.

30. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 owned, operated, and managed the facilities where employees, including Plaintiff, worked. Managers employed by the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 directly supervised employees hired by Cosmopolitan Defendants. These managers also monitored employees' productivity, enforced performance standards, handled accommodation requests, and had the authority to discipline employees.

31. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 unilaterally set and enforced all workplace rules, including but not limited to timekeeping procedures (clock-in and clock-out), meal break policies, packing protocols, and operational methods, which

Cosmopolitan Defendants' on-site representatives enforced. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 also dictated employees' schedules.

32. All issues arising from employees' day-to-day work and factory operations were directly handled by the Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 or Cosmopolitan Defendants' on-site representatives.

33. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 set wages approved by Cosmopolitan Defendants and maintained sole control over their timekeeping systems used to calculate hours worked, which they then reported to Cosmopolitan Defendants for payroll processing; however, they never maintained or tracked records for actual hours worked and paid Plaintiff, FLSA Collective Plaintiffs, and Class members solely based on the scheduled hours that the factory lines would be operating. *See* Ana Cruz Deposition Transcript**.**

34. The Driscoll Defendant and the JOHN DOE CORPORATIONS 1-999 maintained employee records pertaining to employee performance, attendance, and job duties, further evidencing its role in managing its workers' employment. *See* Ana Cruz Deposition Transcript**.**

## NATIONWIDE FLSA COLLECTIVE ACTION ALLEGATIONS

35. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt temporary employees hired by Cosmopolitan Defendants (with the exception of temporary employees hired to work at North American Packaging, LLC[1]), including, but not limited to warehouse workers, factory line workers, scanners, drivers, packers, among others, employed by Defendants on or after the date

[1] As *Siri v. North American Packaging, LLC* Case No: 2:25-cv-01186 is in the process of Court approval of a class settlement and, therefore, temporary workers placed at North American Packaging, LLC are excluded here.

that is six years before the filing of this Complaint ("FLSA Collective Plaintiffs").

36. At all relevant times, Plaintiff and FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay them their proper wages, including: (i) unpaid wages, including overtime wages; (ii) liquidated damages; and (iii) attorneys' fees and costs. The claims of Plaintiff stated herein are essentially the same as those of FLSA Collective Plaintiffs.

37. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to the FLSA Collective Plaintiffs via first class mail, email, and text message, to the last contact known to Defendants.

## NATIONWIDE RULE 23 CLASS ALLEGATIONS

38. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt temporary employees hired by Cosmopolitan Defendants (with the exception of temporary employees hired to work at North American Packaging, LLC[2]), including, but not limited to warehouse workers, factory line workers, scanners, drivers, packers, among others, employed by Defendants on or after the date that is six years before the filing of this Complaint or applicable period for State wage laws (the "Class" or "Class

[2] As *Siri v. North American Packaging, LLC* Case No: 2:25-cv-01186 is in the process of Court approval of a class settlement and, therefore, temporary workers placed at North American Packaging, LLC are excluded here.

members").

39. The Class members are readily ascertainable. The number and identity of the Class members are able to be determined from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class member are also determined from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23.

40. To the extent necessary, Plaintiff will designate subclasses for each of the States where Defendants have employees.

41. The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants. There is no doubt that there are more than forty Class members in the Class. The proposed Class includes a Subclass of employees employed by Defendants. This Subclass comprises of Class members employed in the States of New Jersey, New York and California, and States with requirements to provide earning statements and wage notices to employees ("Wage Notice Subclass") who will have additional state law claims against Defendants. There is no doubt that this Subclass also contains more than forty (40) members. Plaintiff is a member of the Class and the Wage Notice Subclass.

42. Plaintiff's claims are typical of claims that could be alleged by any member of the Class, and the relief sought is typical of the relief that would be sought by each member of the Class or in separate actions. All Class members were subject to the same corporate practices of Defendants of failing to pay all regular and overtime wages owed.

43. Due to the failure to include all hours of work and outline overtime premium rates in Class members' compensation, paystubs and wage notices, Defendants violate state laws and regulations.

44. Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

45. Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Plaintiff is represented by attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

46. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against a corporate defendant. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would

result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

47. Defendants and other employers throughout the country violate their respective states' labor laws. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

48. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants are joint employers of Plaintiff and Class members;

b) Whether Defendants employed Plaintiff and Class members within the meaning of applicable state and wage hour laws;

c) What are and were the policies, practices, programs, procedures, protocols and plans of Defendants regarding the types of work and labor for which Defendants did not properly pay Plaintiff and the Class members;

d) At what common rate, or rates subject to common methods of calculation, were and are Defendants required to pay Plaintiff and Class members for their work;

e) Whether Defendants properly notified Plaintiff and Subclass members of their regular hourly rates and overtime rates;

f) Whether Defendants paid Plaintiff and Class members based on a fixed

schedule rather than for their actual hours worked;

g) Whether Defendants tracked and paid Plaintiff and Class members for their actual hours worked;

h) Whether Defendants paid Plaintiff and Class members the proper overtime wages at a rate that is at least one-and-one-half times the regular rate of pay for all hours worked in excess of forty each workweek;

i) Whether Defendants failed to properly pay Plaintiff and Class members for all hours worked;

j) Whether Defendants provided proper wage notices to Plaintiff and Subclass members per requirements of State wage laws; and

k) Whether Defendants provided proper wage statements to Plaintiffs and Subclass members per requirements of State wage laws.

## STATEMENT OF FACTS

***Plaintiff SIRI's Wage Claims:***

49. On or around July 21, 2019, Plaintiff was hired by Cosmopolitan Defendants to work as a warehouse worker at Driscoll Foods, located at 6 Westbelt, Waynem NJ 07470. Plaintiff's employment was terminated in or about May 2025.

50. From the start of Plaintiff's employment until approximately January 2021, Plaintiff was scheduled to work five (5) to six (6) days per week, from 7:00 am to 3:30 pm each day. After January 2021, Plaintiff was scheduled to work five (5) days per week from 10:00 am to 8:00 pm. Plaintiff was only paid for his scheduled, even when his punch records demonstrated longer hours of work. Plaintiff, FLSA Collective Plaintiffs, and Class members worked more than forty (40) hours per week and worked hours in excess of their schedules which went uncompensated.

51. When hired, Plaintiff was paid at an hourly rate of fifteen dollars and fifty cents ($15.50) per hour. During his employment, Plaintiff's hourly rate was increased, variably, up to seventeen dollars and seventy-five cents ($17.75) per hour. Plaintiff was paid weekly by pre-paid

cards. FLSA Collective Plaintiffs and Class members were paid in a similar manner and similar hourly rates.

52. Defendants tracked hours worked by Plaintiff, FLSA Collective Plaintiffs, and Class members by requiring them to clock in when they entered the factory premises and to clock out when they exited. However, rather than paying them based on actual punch-in/out records maintained by Defendants, Defendants only paid Plaintiff, FLSA Collective Plaintiffs, and Class members for their scheduled hours only, regardless of how many hours were punched in. Defendants did not believe that hours spent after clocking in devoted to preparing for the factory lines to run constituted work, and only paid employees for the hours that factory lines were scheduled to run. Defendants also automatically deducted meal breaks and short breaks (20 minutes or less) from employees' compensation, even though employees would be engaged in work during meal breaks and short breaks for the benefit of Defendants.

53. FLSA Collective Plaintiffs and Class members were underpaid by similar amounts.

54. Defendants knowingly and willfully operated their business with a policy of not tracking all hours worked by Plaintiff, FLSA Collective Plaintiffs, and Class members' hours, and thus not paying Plaintiff, FLSA Collective Plaintiffs, and Class members for all regular and overtime hours worked. Defendants' violations were clearly willful because they were clearly aware of the discrepancy between what Plaintiff and other employees were being paid and what they were entitled to on the basis of hours worked.

***<u>Plaintiff and Subclass Members' Claims for Improper Wage Notices and Earning Statements:</u>***

55. Plaintiff and Subclass members never received proper wage notices from Defendants. They also did not receive accurate wage statements from Defendants. 41 of 50 States require paystubs with accurate information as to employees work hours and rates of pay.

56. Defendants further violated the NJWPL, New York Labor Law' Wage Theft Prevention Act ("WTPA"), California Labor Code 226 LC, and other relevant state wage and hour laws by failing to provide Plaintiff and Subclass members with accurate wage statements, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA and applicable state laws. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, at *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time *actually* worked by tipped employees") (emphasis added); *Copper v. Cavalry Staffing, LLC,* 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour *actually* 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp*., 2021 U.S. Dist. LEXIS 151528, at *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours *actually* worked") (emphasis added).

57. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the legislatures of the states that Subclass members worked. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, at *21-22 (S.D.N.Y. March 20, 2020)

58. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Subclass members. Defendants' conduct actually harmed Plaintiff and Subclass members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay, including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Subclass members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

59. Had the wage statements Defendants provided to Plaintiff and Subclass members accurately listed the total number of hours Plaintiff and Subclass members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked. Either possibility would have allowed Plaintiff and Subclass members to vindicate their rights under their respective State wage laws. The deprivation of these possibilities therefore constitutes an injury.

60. The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Subclass members. This delayed payment caused Plaintiff and Subclass members to struggle to pay bills and other debts.

61. Defendants knowingly and willfully operated their business with a policy of not

providing proper wage notices and wage statements as required by State wage laws, including NJWPL, NYLL, and California Labor Code 226 LC.

62. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on employees' wage statements. See *Mills v. Mills*, 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-2 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[3]

63. The effect of reporting reduced wages on an employee's W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n*, 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400

---

[3] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

(1997)); *Coward v. Zurich Am. Ins. Co.*, 2011 U.S. Dist. LEXIS 74543, *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

64. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v. Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18, (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

65. Here, it is clear that Defendants' failure to provide Plaintiff and Subclass members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Subclass members. That, in turn, would have increased Plaintiff's and Subclass members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

66. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay

> their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

67. The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Subclass members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

68. Whether or not any Subclass members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

69. The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4),

> which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Calderon,* 999 F.2d 1101 at 1106.

70. Here, the problem is not merely challenging but insurmountable. Plaintiff and Subclass members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Subclass members. The problem, rather, is that Plaintiff and Subclass members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

71. Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices, at the beginning of employment and annually thereafter, pursuant to the requirements of NJWPL, NYLL, and other state wage laws.

72. Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and statements as required by NJWPL, NYLL, and other state wage laws.

73. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that clearly entails a concrete risk of harm to an interest identified by the legislatures of the states of which Subclass members worked in. Defendants' failure to provide such notices trivializes the importance of these notices in protecting Plaintiff's interest in

ensuring proper pay. Despite Defendants' conduct, there is a reason why the State legislature concluded that enacting wage notice provisions would "far better protect workers' rights and interests" than existing penalties. *See* N.Y. Spons. Mem., 2010 S.B. 8380. Written notices function as a means of apprising employees of their rights and of their employer's obligations towards them, empowering employees to advocate for themselves. Deprivation of such notices necessarily entails a significant risk of harm to the employees' concrete interest in being paid properly and timely.

74. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Subclass members. Defendants' conduct actually harmed Plaintiff and Subclass members. Defendants' failure to provide paystubs listing all hours and rates of pay, including overtime hours and overtime rates and the failure to provide a wage notice properly listing the rate and frequency Plaintiff and Subclass members were entitled to get paid, deprived employees of the ability to contest Defendants' calculations, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff and Subclass members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Moreover, Defendants' failure to provide wage notices allowed Defendants to hide the proper frequency of pay to employees. Defendants' failure to provide a wage notice to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

75. Due to Defendants' failure to provide legally mandated notices such as earning statements and wage notices, Defendants were able to hide their wrongdoings from employees, and continue to attempt to hide their wrongdoings necessitating the current litigation. The failure to provide notices continues to result in delayed payment of all proper wages owed to Plaintiff and

Subclass members. This delayed payment caused Plaintiff and Subclass members to struggle to timely pay bills and delay or forgo purchases.

76. Defendants knowingly and willfully operated their business with a policy of not properly compensating either FLSA overtime rate (of time and one-half) or the State wages and overtime (of time and one-half) to Plaintiff, FLSA Collective Plaintiffs, and Class members.

77. Defendants knowingly and willfully subjected Plaintiff, FLSA Collective Plaintiffs and Class members to a policy of not paying them for all hours worked, including overtime, in violation of the FLSA and applicable State wage laws.

78. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and the Class, in this litigation and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## NATIONWIDE VIOLATION OF THE FAIR LABOR STANDARDS ACT

79. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

80. At all relevant times, Defendants were and continue to be an employer engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

81. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

82. At all relevant times, Defendants had gross annual revenues in excess of $500,000.

83. At all relevant times, Defendants had a policy and practice of failing to pay Plaintiff

and FLSA Collective Plaintiffs for all hours worked, including their overtime premiums for hours worked over forty each week.

84. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of the Court to amend this Complaint to set forth the precise amount due.

85. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs for all hours worked, including overtime hours, when Defendants knew or should have known such was due.

86. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

87. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

88. Due to the intentional, willful and unlawful acts of Defendants, Plaintiff and FLSA Collective Plaintiffs suffered damages in an amount not presently ascertainable of unpaid overtime premiums; unpaid wages, including overtime; plus an equal amount as liquidated damages.

89. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT II

## VIOLATIONS OF THE NEW JERSEY WAGE PAYMENT LAW AND THE NEW JERSEY WAGE AND HOUR LAW

90. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

91. At all relevant times, Plaintiff and New Jersey Class members were employed by Defendants within the meaning of the NJWPL §34:11-4.1.

92. Defendants knowingly and willfully failed to pay Plaintiff and New Jersey Class members for all hours worked, including overtime premiums for hours worked over forty each week.

93. Defendants knowingly and willfully operated their business with a policy of not providing Plaintiff and New Jersey Class members with proper wage notices, at date of hiring and annually thereafter, as required under NJWPL.

94. Defendants knowingly and willfully operated their business with a policy of not providing proper wage statements, as required under NJWPL.

95. Due to the Defendants' NJWPL and NJWHL violations, Plaintiff and New Jersey Class members are entitled to recover from Defendants unpaid overtime premiums; unpaid wages, including overtime; reasonable attorneys' fees; liquidated damages; statutory penalties and costs and disbursements of the action, pursuant to the NJWPL and NJWHL.

## COUNT III

## VIOLATION OF APPLICABLE STATE WAGE AND HOUR LAWS

**(brought on behalf of a Rule 23 Class)**

96. Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein.

97. At all relevant times, Class members were employed by Defendants within the meaning of the applicable state wage and hour laws, just as Plaintiff was employed by Defendants under the meaning of the FLSA.

98. Plaintiff can represent the Class because the requirements of the FLSA and the requirements of the state labor laws enumerated earlier are identical for purposes of his overtime class claims.

99. Defendants knowingly and willfully violated Plaintiff's and Class members' rights by failing to pay them for all hours worked, including the proper overtime compensation at rates of not less than one and one-half times the regular rate of pay for each hour worked in excess of forty (40) hours in a workweek due a policy of underreporting employees' hours, in violation of the state wage and labor laws outlined above.

100. Defendants knowingly and willfully failed to provide proper wage statements and notices to Subclass members, as required under State wage laws.

101. Due to Defendants' state law violations, Plaintiff and Class members are entitled to recover from Defendants their unpaid compensation for all hours worked, unpaid overtime premiums, statutory penalties, liquidated damages, and reasonable attorneys' fees and costs and disbursements of the action.

102. In addition to violations of State Labor overtime laws under which Plaintiff brings class (not individual) claims, Defendants violated State provisions requiring employers to pay employees all wages owed. Since overtime wages are owed under the FLSA, these laws encompass class members' claims.

103. Some states' wage and hour or wage payment statutes may prescribe means other than class actions for pursuing common claims. Any state restrictions on class actions are

irrelevant, however, as this case was filed in federal court, where the Federal Rules of Civil Procedure hold. See *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 400 (2010) (F.R.C.P. 23 authorizes "class actions across the board" notwithstanding state law restrictions on class actions); *Dremak v. Iovate Health Scis. Grp., Inc. (In re Hydroxycut Mktg. & Sales Practices Litig.)*, 299 F.R.D. 648, 654 (S.D. Cal. 2014) ("[A]pplication of Rule 23 to Plaintiffs' [FBPA] claims does not run afoul of the Rules Enabling Act. Rule 23 governs Plaintiffs' claims, and Plaintiffs' claims are not subject to dismissal based on the state statutes prohibiting class actions.").

104. Due to Defendants' state law violations, Plaintiff and Class Members are entitled to recover from Defendants their unpaid wages, unpaid overtime premiums, statutory penalties, liquidated damages, and reasonable attorneys' fees and costs and disbursements of the action.

**COUNT IV**

**VIOLATION OF CLASS MEMBERS' CONTRACTS AND/OR DEFENDANT'S UNJUST ENRICHMENT**

(brought on behalf of a Rule 23 Class)

105. Plaintiff realleges and incorporates all the foregoing paragraphs of this Class and Collective Action Complaint as if fully set forth herein

106. To the extent that the Fair Labor Standards Act and/or State wage laws do not protect employees for a failure to compensate gap-time claims (claims for unpaid wages for hours worked up to forty which do not implicate statutory minimum wage laws), Plaintiff and Class members assert such claims under breach of contract and unjust enrichment.

107. When Plaintiff and Class members entered into employment with Defendants, the parties formed implied contracts, which contain inherent duties of good faith and fair dealings, to pay employees at agreed upon hourly rates for all hours worked.

108. Plaintiff and Class members provided services to Defendants as required under their agreements. However, Defendants' failure to compensate all hours of work, including gap-time hours, breached the Plaintiff's and Class members' agreements.

109. As a direct and proximate result of Defendants' failure to act fairly and in good faith, Plaintiff and Class members are entitled to recovery of the full amount of wrongfully withheld or diverted payments, punitive damages due to egregious conduct, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

110. Moreover, absent an implied contract, by virtue of Defendants' conduct as alleged herein, and Plaintiff's and Class members' performance, Defendants were unjustly enriched by the Plaintiff's and Class members' conduct and did not compensate Plaintiff and Class members fully.

111. The circumstances are such that it would be inequitable to allow Defendants to retain the excess benefit from Plaintiff and Class members conduct without paying fair value for it.

112. As a direct and proximate result of Defendants' wrongful withholding of funds that should have been paid to Plaintiff and Class members, they have sustained damages in an amount according to proof at trial.

113. Defendants' withholding of proper compensation from employees was done with malice and in conscious disregard of Plaintiff's and Class members' rights with the intent to cause injury to Plaintiff and Class members. Plaintiff and Class members are entitled to recovery of the full amount of wrongfully withheld or diverted payments, punitive damages due to egregious

conduct, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and State wage laws;

b. An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid regular and overtime wages due under the FLSA and State wage laws;

d. An award of liquidated damages as a result of Defendants' willful failure to pay wages pursuant to the FLSA;

e. To the extent not covered by wage laws an award for unpaid wages pursuant to breach of contract and/or unjust enrichment;

f. An award of liquidated damages as a result of Defendants' willful failure to pay wages, pursuant to State wage laws;

g. An award of pre-judgment and post-judgment interests, costs and expenses of this action together with reasonable attorneys' and expert fees;

h. An award of statutory penalties for the Subclass;

i. Designation of Plaintiff as the Representative of the FLSA Collective Plaintiffs;

j. Designation of this action as a class action pursuant to F.R.C.P. 23;

k. Designation of Plaintiff as Representative of the Class;

l. Designation of Plaintiff as Representative of the Subclass; and

m. Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: February 20, 2026

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**

By: *\/s/ James Jackson*

James Jackson, Esq. (JJ 419892022)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: (212) 465-1188
Fax: (212) 465-1181
*Attorneys for Plaintiff, FLSA Collective Plaintiffs and the Class*